Good afternoon. We have one consolidated set of cases for argument this afternoon. Cases number 23-1647, 1648, 1649, 1650, 1651, 1652, and 1781. The lead case is OI European Group v. Bolivarian Republic of Venezuela. And Mr. Verrilli, when you are ready, you may proceed. Take your time. Good afternoon. You may please the court. I'm Don Verrilli. I represent the Republic. I am arguing this afternoon on behalf of both the Republic and PDVSA. PDVSA's counsel, Mr. Perla, is here at council table. And if the court has any questions that it wants to direct specifically to PDVSA, he is here to answer those questions. Of course. I appreciate reserving five minutes for rebuttal, please. Of course. Great. We raised two issues. First, we challenged the district court's finding of FSIA jurisdiction based on the ban check alter ego analysis. And second, we invoked this court's pendant jurisdiction to challenge the district court's conclusion that federal common law overrides Rule 69A's textual command that state law governs the question of whether the assets at issue in this case can be attached. What I'd like to do, if I could, is start with one big picture observation about each of those two issues and then move to the specifics. As to alter ego, it probably is not lost on this court that the large majority of cases applying ban check's complete domination test find that the test is not met. That is not an accident. It's a serious thing to disregard the juridical separateness of a foreign state instrumentality. It implicates our government's foreign relations interests. It implicates international comity and reciprocity principles. That is why ban check imposed a strong presumption of juridical separateness. To overcome that presumption, courts can't rely on the normal instruments of instrument, excuse me, the normal incidence of instrumentality status. And they have to rely on probative evidence much more substantial than hearsay anonymous allegations in newspaper articles. In the case that the parties are calling Crystal X2 from this court. Do you think that's a fair statement of what ban check says? Because it seems like at least twice you've ratcheted up what ban check actually wrote. Ban check doesn't talk about complete domination. That's a gloss that was added by the circuit courts. And it doesn't talk about insubstantial evidence. It talks about a balancing of the five factors, which are to be looked at as a totality of circumstances. So I certainly agree with the basic premise that this is a serious inquiry, but is it the inquiry that you're stating or is it something that is, you know, we look at the five factors as Rubin has explained and we look to the totality of the circumstances and apply them. So, Your Honor, I think it's certainly the test that we're advocating here. The phrase complete domination actually comes from the opinion of this court in Crystal X2 involving the Maduro regime. It comes from the D.C. circuit and we apply it. Yes, but also it was what this court followed in Crystal X2. And in that case, of course, I do think it's quite a useful starting place for thinking about this case is to contrast it with the facts of that case because in that case we're talking about the Maduro regime. And in addition to the normal incidence of instrumentality status, which I'd like to go through, but to just make the contrast first if I could, what you had in that case was Maduro appointed not only PDVSA's board, but all of the corporate officers. And he didn't just appoint them. He appointed government military officials who were under his direct command and he commanded them what to do. And they made decisions about the day-to-day operation of PDVSA under that regime. They told PDVSA to sell oil to the Maduro regime's political allies at far below market rates. They told PDVSA to forbear from collecting on the payment obligations for those. And when the payment obligations came to be paid, they didn't go to PDVSA. They went to the public directly. Maduro ordered PDVSA to purchase and to run business, ancillary businesses that had nothing to do with the oil business. And, you know, I can go through the rest of the factors, the facts on which the court ultimately rested its finding of alter ego status in that case. And I do think it's really important here, in terms of Your Honor's question about the totality of the circumstances, to take a step back. It is certainly the case that Judge Stark had a very long list of facts that he considered as part of the totality of the circumstances. But I think it's useful to distill them into three categories of facts, and then I'll try to deal with each category separately if I could. The first category is what I will call the normal incidence of instrumentality status, sole ownership, appointing the board, coordination on policy, et cetera. The second category is what I'll call extraordinary oversight by the interim government and the National Assembly. There are several instances of that, the bonds, for example, and the extraordinary payment of legal expenses. And then the third category, I think, I don't know how else to refer to it, but they're just errors. Reading the law of Venezuela to say exactly the opposite of what it actually says, in particular instances. And then with respect to the newspaper article point, I do think, Your Honor, that the finding of commingling of PDVSA and Republic funds, and the finding that the Republic was funding itself out of PDVSA funds, are, in fact, based entirely on an unsubstantiated anonymous statement in a newspaper article, which is refuted by probative evidence in the form of testimony from the chairman of the ad hoc board of PDVSA that the allegation in the newspaper article was false. All right. Let's assume we set aside commingling and slush fund. Now, our friends, maybe athletes, will want to resurrect that. Let's assume we set that aside. And let's assume we set aside sole ownership, appointment of the board. I want to talk about the extraordinary oversight factors, and those seem to be the most problematic ones for you. I don't think you're disputing, as a factual matter, that the Guaido government treats Venezuela's debt and PDVSA's, PDVSA's debt, as the same. I don't think you're disputing that PDVSA only paid its debt after the Guaido government authorized those payments. I don't think you're disputing that the Guaido government declared the PDVSA bonds void and illegally issued. Are you disputing any of those facts? Some of them, yes, but in a more nuanced way. Okay. Why don't you tell me which of them you don't dispute and then which wrinkles you have and then what legal effect we should consider those to have. We don't dispute that the National Assembly concluded that the bonds, which, of course, are Maduro-issued bonds, were unlawfully issued and, as a result, should not be paid upon. We don't dispute that.  And then the statement that PDVSA, under the direction of the National Assembly, didn't pay its debts, that really refers, can refer, only to what I just described, the decision not to make the payment on the bonds. Okay, but the authorization of the interest payment on the bond, you agree that they made? The National Assembly, in the exercise of its regulatory power, to declare that those bonds were unlawful. All right, so you are going to argue about what the legal effect of that is, but you're not disputing the underlying fact? That underlying fact. Okay. But the word debts I want to be careful about because the district court's opinion said debts, plural, and seemed to me, making a general statement, it was about that one payment. Fair enough. And that's it. And then, I apologize, Your Honor, I've lost track of the first of the points that you raised. The Guaido government intended to treat PDVSA's debt as the same as Venezuela's debt in eventual debt restructuring. We do dispute the implication or inference that the district court drew from that fact. You don't dispute the raw fact, but you think the district court misapprehended its significance. No, what the district court did, I think, was misinterpret or attribute much more meaning to public statements that were made than they can fairly bear. You don't dispute the public statement? That's where I would agree. We don't dispute the public statements were made, but we think the inference drawn from the public statements is not one that those statements can fairly bear. All those statements were that we're going to have to have a global reckoning at some point. We're going to have to deal with all of these debts, you know, obligations of the Republic, obligations of PDVSA. We're committed to treating everyone fairly in that process. That's what those statements were. And that, to me, does not show day-to-day control because whether or not we want to quibble about whether the test is complete domination, it certainly is day-to-day control. And that statement shows nothing about day-to-day control. Okay. So we've got the law facts that we agree on in this second category. Are you disputing whether the legal significance of these facts or the applicability of some of these facts varies among ACL, OIEG, Rosoro? Your briefing seems to be treating them all the same rather than saying some of them only apply to some and some to others. You know, there may be nuanced differences, Your Honor. I'm not prepared to follow through with that today. You're not pressing? We're not pressing that. That's correct. But I do think what's critical from our perspective about the things that Your Honor has identified here in that second category is that those are not day-to-day events. Those are one-time, episodic events on matters of great importance where one would expect the government to exercise supervisory oversight. And, as we know, we've cited in our brief several cases that have said that kind of supervisory oversight is not day-to-day control. I think Judge Ginsburg's discussion in the Transamerica case of what day-to-day control means is quite instructive. It's the kind of thing this Court pointed to and Chris elects to, that the government comes in and it tells the instrumentality who your customers are going to be, what you're going to charge, what businesses you're going to be in, those kinds of things. And we have none of that here. We have nothing close to that kind of day-to-day control, in the words of Dantrak, really nothing. And I do think that that really is of critical importance here. You don't have anything like that. You have those few extraordinary events. And if I could just make one more point about them, it's not surprising that you had several extraordinary events right then in 2019 because that's the moment that the interim government came into existence and was recognized by the United States as the legitimate government of Venezuela, and it is when President Guaido and the National Assembly tried to assert their authority to wrest control from the illegitimate Maduro regime and put in the kinds of guardrails to restore the legitimacy of the government and the independence of PDVSA as it operates in the United States. Can we look at everything that goes back from when the interim government, Guaido and the National Assembly, was recognized onward? Is there anything that limits our consideration of the relevant time frame? No, I think that is the relevant time frame. I just would note that there was a stipulation in the district court that the circumstances that led to the end of the Guaido government and the National Assembly now being the only recognized body didn't change the analysis of the parties stipulated to that. But with that proviso, yes, I think that's the relevant time frame and I think it has to be the relevant time frame. And I would point out, if I could, that my friends on the other side, that's not their principal argument by any means. They have, I don't want to say they haven't tried to defend what the district court ruled or the basis on which it ruled they did, but it's their third order argument and I think that says something. And I do think with respect to the fact that they're focused on the actions of the Maduro regime, that there, I do think that there really is, if I could take a minute on that, a significant problem with that. Let's talk about that some, because it does seem like for you to prevail, we have to focus on the Guaido government and the National Assembly. Because you're not disputing that Maduro continues to dominate PDVSA elsewhere. You haven't disputed, you haven't questioned Crystal X2, you haven't disputed that that kind of control continues. So I want to know why that is. You are focusing on the level of the government. Your friends on the other side focus on the level of the state. And the statute talks about the state and the restatement of foreign relations talks about the state. So let's talk first about whether we should be focusing on governments or on states. So a couple things. I just want to make a preliminary factual point and then I will directly answer Your Honor's question. Preliminary factual point is the district court made a factual finding that Maduro, if you want to call it the state, Maduro, has no control over PDVSA in the United States or these assets. That's a factual finding. The wall of separation has worked and Maduro, as a factual matter found by the district court, has no avenue of control. There isn't. Now with respect to the question that Your Honor asked, I think there are two principles of law that say that for purposes of this court's consideration of the case, that the court needs to look at the actions of the Guaido government as the actions of the state, the interim government. And that the first one is the recognition principle that was articulated in Zivotofsky by the Supreme Court, which says that the courts are bound by the recognition decisions of the executive. The executive has recognized. It's kind of begging my question because recognition is of government. And my question is, should we be focusing on governments or on states? The government is, the recognized government is the only entity that can represent the state in this court. And that's the point I'm trying to make. That's the point of the recognition power. And then the second point is the act of state doctrine. A parallel idea here is the act of state doctrine. And what it says is that the actions of the recognized government have to be accepted as the law of the state. And the actions of the recognized government here, the critical ones, of course, were the passage in 2019 of the democracy transition statute and the issuance of the presidential decree. A presidential decree by a legitimate executive is also entitled the act of state status. And those actions are the actions of the state for purposes of this court's review under the act of state doctrine. And those were the actions that created this entirely separate corporate governance structure for PDVSA in the United States, which, of course, PDVSA in the United States has control over the assets that the appellees are seeking. I understand. And I structured the question that way because my follow-up is some of the things we were getting at, which is your reply brief takes the exceptional step of attempting to bifurcate a single corporate entity under Venezuelan law into effectively two different corporations. What would allow us to do that simply because you say, well, control is being exercised over this portion and we should just focus on the board that is here rather than PDVSA as an entity? If we were talking about PDVH or CITCO, that would be a different matter. Those are corporate subsidiaries. But how can we treat PDVSA as something other than a single corporate whole? Well, because I guess what I would say about that, Your Honor, is that treating it as a single corporate whole in the way that the appellees suggest would amount to a violation of the act of state doctrine because it would effectively disregard the actions of the National Assembly to create a separate autonomous governance structure and autonomous action for PDVSA in the United States. Would it entail that? Wouldn't we be saying, okay, for purposes of where the Guaido government does things, we will consider that here, but the U.S. government itself acknowledges, just as a raw brute fact, that in Venezuela, the Maduro government is calling the shots on all the things PDVSA, the corporate entity, does. So I don't see how it would have to be disregarding. Well, I respectfully think it would be disregarding because, as Judge Stark found here, the Maduro government has no control over the assets that the appellees seek to attach. And the entity that does have control over the assets that appellees seek to attach is the PDVSA ad hoc board, which arose as a result of the act of state of the national legislature. And I do think that's critical. And if I could just add... The authority for focusing so narrowly on the control of the particular assets sought to be attached as opposed to more generally assets of the corporate entity as a whole. So I think the answer to that is that we're not focusing on the particular assets. We're focusing on the corporate governing body that the National Assembly gave power over those assets to. And that would be these particular assets and any other assets in PDVSA. So it's not asset by asset. This is about the corporate governance structure and the separate corporate governance body that the National Assembly created and identified. And the additional point I'd like to make about this is... Can I just add, kind of tying to the last question Judge Bufast asked, I understand you point to the recognition doctrine, the act of state doctrine, and some person views the political question doctrine to say the government that's recognized by the executive branch, that's the one that we're going to assume is the controlling body. What's the best authority for making that determination under the FSIA when we're defining the word state? Because I'm not sure I've seen that, and I'm wondering if your argument requires us to reach that holding that for the purposes of the FSIA, state means the recognized government that the executive has identified. I think it's a necessary... I don't have a specific case that I can cite, Your Honor, but I do think it's a necessary implication, both of the recognition doctrine and the act of state doctrine, that that has to be what it means under the FSIA here. Because to do otherwise, to do what my friends on the other side are suggesting here, would actually be to credit in a United States court as determinative, outcome determinative, the actions of a government that the United States not only doesn't recognize, but has derecognized to reach the conclusion that they want to reach. That would be what happens in the analysis, and I really think that that's something respectfully that the court can't do and shouldn't do. I'd like to make a point, if I could, about... I realize my time is short here, but I'd like to make a point, if I could, about the normal incidence of instrumentality status, and then spend a few minutes, if I could, on the Will 69 issue. With respect to the normal incidence, I think this is quite important. Although there was a lot in the district court's opinion, the normal incidence played an important role. If one goes through the fact, for example, that under the Constitution, the state owns the oil. The fact that the state is the sole shareholder of the corporation. The fact that the state appoints the board of directors. The fact that the profits go from Pettivesa to the state. The fact that there's coordination on policy. You know what all those things are also true about? The Tennessee Valley Authority and the Federal Reserve Banks. With one exception, the Federal Reserve Bank, but in general, the Tennessee Valley Authority. All those five things are indisputably true about it, but no one would think that that points to the conclusion that they are the alter ego of the United States for purposes of the United States debt. Sure, but at least one of the Benchmark factors is a normal incident, right? I mean, the extent or whether the entity's profits go to the government. Yes, but I think, Your Honor, our take on that, as we try to suggest in our brief, is that it's a more subtle inquiry because as several courts of appeals have noted, I believe it's the EM case, for example, in the Second Circuit, that because that's an entirely normal thing for the profits to go to the flow to the government as the sole shareholder of a foreign state instrumentality, that what the Benchmark factor is getting at is something more nuanced, and it's something that came up in Crystal X-2, which is that an inappropriate draining of the profits from the instrumentality into the coffers of the government. For example, what happened in Crystal X-2 under Maduro was that Petabasa was subject to an enormous exorbitant tax that wasn't generally applicable, which essentially is looting the assets of the profits of Petabasa and putting them into the coffers of the republic. I wonder if that doesn't blur the control and fraud parts of the test, right? Certainly, it's easier if you have that, and I imagine you're going to say, yes, Crystal X-2 relied on all those factors, but it relied on those because there were also these additional incidents of what we might call bad acts. But why is that a necessary element as opposed to a sufficient finding of control? Why do those things just go out when there's no evidence? I realize I may have sounded like I was overstating a little bit, so let me try to be precise. We don't think they go out entirely. According to Crystal X-2, the panel did look at those factors, but I think what they are is table stakes, that in the absence of those factors being present, what argument is there even that there's a possibility of exercising permissible day-to-day control? But I think the problem with the district court's analysis and I think the problem with the argument of my friends on the other side is that they think that those get you 95% of the way to alter ego status, and I think that is fundamentally, and that you just need a little more to get over the finish line. I think that is fundamentally inconsistent with Banshek's articulation of a strong presumption of separateness. In fact, it flips the presumption in the other direction. If those things get you a long way, those are going to be present in virtually every case of foreign instrumentality. So it's got to be something very much more, and I do think, maybe to go back to something I said at the outset with a little more specificity, if one looks at the cases where courts of appeals have found alter ego status, Crystal X-2, the Turkmenistan case, the facts are really serious domination of day-to-day operations. If one looks at the cases where courts of appeals have consistently found no alter ego status, Transamerica, EM, NML, et cetera, you'll find facts like the facts in this case, where there may be episodic supervision, those corporate, those incidents of instrumentality status are there, but you don't have the kinds of things that the Transamerica court described, telling the instrumentality who the customer is going to be, what they're going to charge, what business they're going to be in, et cetera, that kind of day-to-day control. You don't have it. You just don't have it here. You don't. Thank you. We'll get you back on rebuttal. Your Honor, I would like to have the chance to address Rule 69, but obviously that's on the court's discretion. Thank you. Okay. We can give a few minutes of rebuttal. Mr. Solins? Yes, sir. Do you pronounce the L or not? I do. Solins, just like that. Okay. Thank you, Your Honors. May it please the Court. I'm David Solins on behalf of the OI European Group. I'll be presenting argument today on behalf of all appellees. Let me start with the issue of the alter ego analysis and the BANSEC factors. Most of Venezuela's arguments about alter ego depend on distorting the proper focus of that analysis. They say the court can look only to the level of control that the interim government exerts over PDVSA's U.S. assets. Now, even within that cramped approach, as the district court specifically found, we win. But it bears emphasis at the outset that BANSEC is not so limited. This court made clear in Crystal X-2 that the alter ego question turns on whether a foreign sovereign exerts dominion over the corporate instrumentality so extensive as to be beyond the normal supervisory control. If so, then equity requires that the court ignore the formal separateness of the two entities. So who is the relevant foreign sovereign here? The relevant sovereign is the Republic of Venezuela. And who is the Republic of Venezuela? We have an answer for that, Your Honor, and it's given to us by the United States Executive Branch. It's very clear. The government of the Republic of Venezuela is defined in the executive orders that we cite to include all of the government and the state of Venezuela, all of its government agencies, all of its instrumentalities, including specifically PDVSA, which is determined by the executive in the United States to be the instrumentality of the Republic of Venezuela. Not just the U.S. part of it, all of it, one entity, the instrumentality of Venezuela. And specifically that anyone still affiliated with the Maduro regime is still defined to be part of the government of Venezuela by the United States Executive Branch. So it's simply not the case that U.S. recognition, and I'll get more into that in a moment, that U.S. recognition does not, what it means is that the recognized interim government is the entity that can come into the United States courts and speak on behalf of PDVSA, again, all of PDVSA, not just the U.S. assets of PDVSA. But it does not follow, and, in fact, we have, again, specific definitions and directives. The policy of the United States defines the interim government as the recognized government of Venezuela, to be sure, but it also recognizes the Maduro regime and PDVSA throughout the world, and especially in Venezuela, as part of the government of Venezuela. And so it is definitely appropriate to look to, in fact, we would say required under BANSEC and under Crystal X2, to look at the entirety of the Republic of Venezuela and its governments, and to look, on the other hand, at the relationship between that and all of PDVSA, not just some subset of PDVSA's assets or a particular governing board. So PDVSA's briefs lean heavily on the merit, and that has me in mind of the active state doctrine that Mr. Verrilli pushes. But is there a distinction between using an active state as a sword and giving it legal effect versus recognizing the power of a government without legitimating its laws? Like, what is the relevant dividing line here, or how would you distinguish the active state doctrine and the merit? Right. So thank you, Your Honor, for that question. So, again, I think the problem that my friend on the other side has in trying to define the relevant alter ego analysis here as being just the interim board and the U.S. assets, among other things, is that, one, it runs completely afoul of the United States' own statements of what is the government of Venezuela, which I just articulated. The second is it completely ignores the line of cases that we point to in our brief, page 33. The best case is probably the Republic of Iraq case. It's that line of cases that deals specifically with what do you do when an unrecognized by the United States governmental actor commits wrongs and harms abroad, and when are they attributable to the state, even though it wasn't the recognized government that did the action. And those cases walk through the restatement on active state, and they walk through all those elements. If you look at those, you will see every one of those elements are satisfied here. And I'll just share a little bit of the quote from those Republic of Iraq cases, just to give you a sense of how that analysis works. If you look at the SDNY decision in that case, quote, the legitimacy of the Hussein regime's rule does not affect whether the regime's acts may be attributed to the Republic of Iraq. Indeed, courts have attributed conduct of allegedly unlawful regimes to the states they purported to represent. An attribution operates independently of diplomatic recognition. A state is responsible for the conduct of its effective government, whether or not the government is recognized by other states. What matters is control. And then that was affirmed by the Second Circuit, which, again, pointing to the restatement, pointing to the active state doctrine, walked through this analysis very clearly and said a foreign government's actions are attributed to the state, regardless of whether they are done by the authority of a de jure or titular or a de facto government. Venezuela ignores all of those cases. They don't refer to them at all, despite their prominent feature in our brief. They don't refer to the executive orders that I mentioned before or those portions of the OFAC orders that clearly recognize that the Hussein regime is part of the government of Venezuela, not the recognized part. They can't come into U.S. courts and speak on behalf of PDVSA. In fact, one of the cases that Venezuela points to in their reply brief for this proposition is the Eleventh Circuit's decision in PDVSA litigation fund versus Luke Oil. And there, while what was issued there was whether the Maduro, the board appointed to govern PDVSA by the Maduro regime, could come into a U.S. court and sue on its behalf. And the Eleventh Circuit, you know, concluded, of course, that it could not. But it was very clear, repeatedly stated, that there is only one PDVSA. And the issue was who can come in and speak on their behalf. There is no support for the idea that there was somehow a divorce or a split, and now PDVSA is two separate entities. That's inconsistent with reality. That's inconsistent with the United States government's own statements about PDVSA being part of the government of Venezuela. And it's a complete invention in their reply brief, to be honest, and it should not be credited. And it's inconsistent fundamentally with what is required under BANSEC and this court's decision in CRYSTAL-X. Again, the question is the relationship between Venezuela as a sovereign state in its entirety and the corporate instrumentality, PDVSA, in its entirety, whether you're talking about PDVSA's operations in Venezuela, the United States, or abroad. That's what you have to look to to determine the amount of control and whether the corporate separateness should be disregarded. And if you would get that part right, in our view, then I think they've conceded that there's no separateness. They have not made any argument to the contrary, and that is, in fact, I think the only outcome. Now, even if you turn – one more point. I think it's important to remember on this that the whole focus of the BANSEC totality of the circumstances analysis is to cut through form and get to the reality on the ground. And the idea that you can manipulate how you define what you're comparing for alter ego purposes so that you can avoid the unpleasant facts of what's really going on in Venezuela that everybody knows about runs completely contrary to the whole point of the BANSEC analysis. And I think CRYSTAL-X makes that clear. Again, one other point about CRYSTAL-X. The court there was dealing with the same assets that we're dealing with here in the United States, the same shares of PDBH. The court did not just look at the elements of control in the United States. It looked at the elements of control throughout the world and in Venezuela. And it also looked at the elements of control over time. It didn't just look at the Maduro regime. It looked back to Chavez and everything else. It's a wholesale totality of the circumstances inquiry. That's what's required. But even if you do just focus on what the interim government has been doing with regard to its control over the assets in the United States, the district court's careful fact finding with regard to that should be respected. I think Mr. Verrilli has a point here about the commingling and the slush funds. Do you defend those findings? We do, Your Honor. And we would point out a couple of things. So, first of all, the idea that somehow it's wrong to consider news articles about what public events going on with regard to these entities. This court, I point the court to what this court said in Crystal X-2, where addressing the question of whether or not clear and convincing evidence should be required or preponderance of the evidence, the court emphasized how difficult it is to gather information from sovereign entities like this. And so, therefore, you have to allow evidence in and have a standard that allows a proper inquiry to take place. The court, if you look at footnote 12, says the parties here rely chiefly on expert affidavits, exactly what we have here, the Gomez affidavit that is extensively relied upon by the court below, publicly available corporate documents, which we also have here. We can walk through some of those, including the decrees and others from the National Assembly governing the conduct of PETAVASA here. And then news articles is the third thing the court said it looked to. So all of the record that they say, how dare you, you can't rely on that, all of that was relied upon in Crystal X-2. And this court not only didn't raise any objections to it, but it noted specifically that those news articles were part of the district court's analysis. And so we do think that that's an appropriate thing to look to. In addition, the district court, even if we say articles to be considered, the article just said Trump administration gave the Venezuelan opposition access to U.S. bank accounts containing billions belonging to the state-owned oil company PETAVASA. Is that enough for us to find that Guado government used these funds like a piggy bank? So there is more than just that, Your Honor. One, I do think the fact that the United States administration opened up all of the accounts of PETAVASA in the United States and made them available to the interim government. Why? So that they could fund their operations. It's not the case that they were particularly flush with other resources. It's interesting in their reply brief, they say, well, our argument about that disregards that they did put on evidence that they had other resources. And you know what they cite? On page 11 of their reply brief, they cite a newspaper article that just says among the things that they accessed in addition to specifically PETAVASA's accounts were accounts of the National Bank in the United States. But it could easily be that those held funds from PETAVASA in those accounts. So it's not the case that there's anything that shows they had much in terms of any other resources. We also point to other newspaper articles that talk about the paying of their own legal expenses. And it's sort of conceded at this point that they did reach into PETAVASA's accounts and pay not PETAVASA's legal expenses, but the republic's legal expenses from those accounts. The republic's legal expenses for the PETAVASA litigation. Correct. Well, not for PETAVASA's expenses, but for the republic's expenses in regard to that litigation. And what we're told is that there's a statement from the then chair of the ad hoc board that said it was a loan. But you know what you won't find anywhere in the record is any documentation of that loan, any reference to what the interest rate was or the repayment schedule or anything else. There's just that one, we would say, self-serving statement that it was a loan. Even if you were to think that it was, there's nothing normal and ordinary about a sovereign reaching into the accounts of its oil instrumentality and giving itself a loan. Maybe if it was the central bank, that's the EM case that they rely on and that they like. The fact that they think the accounts of PETAVASA are comparable to a central bank, we think only makes our point that this was not ordinary elements of use of funds and control, and it is interaction with the day-to-day things. With regard to other aspects of exceptional control, we think a few things are really worth focusing on here. One, I think it's clear from this record, and the district court specifically found, that PETAVASA and its ad hoc board could not approve even regular day-to-day type contracts, at the very least if a foreign entity was involved in that contract. They couldn't pay their own legal expenses without prior authorization. A shareholder doesn't normally get to require prior authorization for payments of legal fees or entering into contracts. There's a specific finding if you look at Joint Appendix 49. This is paragraph 107 of the district court's decision. The district court specifically found that the interim government required approval of every national interest contract, and the court points to litigation that went on in that 2020 Citgo bond litigation in New York, and it points to PETAVASA's brief in that case, which indicated that every PETAVASA contract was a national interest contract. That's a specific finding, that there was no contracting without prior approval. That's extensive control over regular operations. That's not some exceptional one-time thing. If you look at, we've already had discussion over the bonds, the same thing there. You have prior authorization and control over whether you can make these payments and whether you have to challenge them and you have to stop the payments. You also have a clear record of the interim government repeatedly referring to PETAVASA's assets in the United States as assets of the sovereign entity, and the Supreme Court in BANSEC made it very clear that to be treated as a separate, independent entity, the instrumentality's assets and liabilities must be treated as distinct from those of its sovereign. That's a quote. And here we have just the opposite. If you look, for example, at the agreement that authorizes the creation of the special fund, litigation fund, which we point to, this is a JA 8214, it incorporates into that fund all of PETAVASA's assets in the United States, all of its accounts in the United States, and it makes clear that those resources are the, quote, assets, property, and interests of the Venezuelan state abroad. And it's also clear that they can't make any expenditures of those funds without prior authorization. In fact, if you look at that agreement, it's really quite remarkable, Your Honors, in that it authorizes, and, again, this is at JA 8205. First, it has to authorize a specific payment of $2 million for legal fees on a one-time basis only, which, again, is not a normal incident of control. It's not like a major bond or anything else. That's just a payment of legal fees. But then if you look at the second part of that issuance from the National Assembly, it authorizes, not PETAVASA, it authorizes the special attorney's office of the Bolivarian Republic of Venezuela so that it complies with the statutes and other things here. It, the it here is not PETAVASA, it's the special attorney, may sign the contracts required to meet the objective identified in this agreement. And to that end, the prior authorization will be needed of the Permanent Finance and Economic Development Commission of the National Assembly to ensure that proper principles and fiscal responsibility and the requirements of the National Assembly are met with regard to contracting. It's all contracting. This is not how a normal independent corporate instrumentality operates. And it comes right from the very beginning with the transition statute, which, again, it's understandable why this was the step that was taken given the crisis in Venezuela. So this isn't to fault any of these judgments that are being made, but it is to reflect the reality that this is not a separate and independent corporate instrumentality that can govern itself in a meaningful way. If you look at Article 36 of that transition statute, it specifically states that the assets that are recovered through the mechanisms that are established there, and that includes all of PETAVASA's accounts, quote, may not be disposed of or realized until the usurpation ends, that's the Maduro regime, and a provisional government of national unity is formed. And so they're just not allowed to expend any money without prior authorization. And you see that in contracting. You see that in bonds. You see that in legal fees. And that is referenced repeatedly in all of these other decrees and agreements that are published by the National Assembly with regard to this. They continuously make reference to Article 36, and they make clear that prior approval, either from the special attorney's office or from a standing committee of the National Assembly, is required before those payments can be made. Why? Because it's the fundamental strategy to accumulate as much resources as possible so they have resources and can use them to help push Maduro out and regain control of their country. Again, very understandable, but it does not make for an independent separate entity. In fact, our expert that was relied upon by the district court, Mr. Gomez, made very clear and explained why, that if anything, since the recognition of the interim government, you have even less independence in some respects with regard to PDVSA because you now have two competing governmental entities asserting control over different parts of the company, trying to accumulate all the assets they can to keep them out of the hands of the other, and you have this terrible tug-of-war situation, which I think we can all feel sympathy for, but that does not improve the independence and separateness of the PDVSA entity. And so for all those reasons, we think it's clear whether you look just at the interim government or if you do the analysis as we think is required and look at the totality of both the sovereign as a whole and the instrumentality as a whole, the district court and its very careful fact findings need to be affirmed. If I may, I will shift to the issue with regard to Delaware law and make a few points with regard to that. The key point we would start with here, Your Honors, is that we believe this issue, and we believe it's clear, that it has been resolved previously by the Crystal X2 panel. The appellants are just wrong that Crystal X2 only addressed the alter ego standard applicable to jurisdiction under the FSIA and never decided what source of law governs whether an attachment may issue as to the non-immune party. PDVSA had moved to dismiss for both lack of jurisdiction under the FSIA and opposed the writ of attachment on the merits and relying in part on Delaware corporate law as they say it influenced the federal standard and required a showing of fraud. This court was very clear and affirmed on both of the orders of the district court on immunity and on attachment. The decision was not limited to just immunity and jurisdiction. At page 133 of the opinion, this court rules, quote, we affirm the district court's order granting the writ of attachment. That could only be a merits holding of who owns the property, and it was based solely on federal law governing alter ego. The court held that federal common law controls the alter ego question and it does not require a showing of fraud. And it said specifically, and this again is a quote, BANSEC can be used to reach the assets of a foreign sovereign's extensively controlled instrumentality through post-judgment attachment proceedings and thus determine whether the instrumentality's assets are subject to execution and whether this court has power to issue a writ of attachment. That's at 139. So it wasn't just about jurisdiction. It was also about affirming the order of attachment, and it did both purely as a matter of federal law under BANSEC. And it was right to do so because BANSEC itself makes clear that federal law controls this question. If you look at footnote 11 of BANSEC, for example, BANSEC says that the corporate relationship between a foreign state and its instrumentalities is governed by principles common to both international law and federal common law. And the Supreme Court expressly rejected the notion that the law of the foreign state should control, given the importance, this again is a quote, the importance of developing a uniform body of law, close quote, so that matters bearing on the nation's sovereign relations are not left to the divergent and perhaps parochial state interpretation. So this court in Crystal X applied the BANSEC factors to the attachment question. BANSEC itself says that's a question of federal law. And then the last point I'd make with regard to that, and again I think this is even if you were to disagree with the other two, although with respect I don't know how you would, this is a complete answer which is the text of Rule 69A. It makes clear that a federal statute governs execution of a judgment to the extent it applies. And this court in Crystal X too was very clear that we're not just dealing here with BANSEC, with a federal common law principle that's just floating in the air. What this court said is that the FSIA is a specialized jurisdictional statute designed to address a specific problem, the extent to which foreign sovereigns and their instrumentalities are immune from suit and attachment in our courts. And the BANSEC doctrine is a federal common law outgrowth of that specialized statute that exists specifically to enable federal courts to, in certain circumstances, to disregard the corporate separateness of foreign sovereigns. The court then noted that the Supreme Court decision in Rubin, which dealt with Section 1610G of the FSIA, which were 2008 amendments dealing specifically with terrorism situations and exempting those from the normal BANSEC analysis, that that made clear and implied that with regard to every other case, ordinary cases, they said, under the FSIA, the BANSEC factors require us by operation of the statute. So because of this clear congressional intent, this court held that, quote, so long as PDVSA is Venezuela's alter ego under BANSEC, the district court had the power to issue a writ of attachment on that entity's nonimmune assets to satisfy the judgment against the country. So we think that issue, again, provides no basis to reverse or alter in any way what the district court here did. It was decided in Crystal X it's required under BANSEC, and Rule 69A wouldn't permit it. The cases they cite under Rule 69A do not involve alter ego analysis that would supplant the federal standard in this context. Instead, they deal with things like whether you get discovery in one of these types of attachment situations, what types of assets can be attached, normal, typical procedural things, and it wouldn't affect the substance of federal law the way this does. Your Honor, just the last point I would make, and, again, I express gratitude for the court for its attention, the rapidness with which the court has moved on these issues. As the court is aware, we have a stay that is pending. We're concerned and would ask the courts to continue to be mindful of the schedule in the district court with regard to the sale procedures order. There's a hearing set towards the end of June, June 26, I believe it is, on that. We would urge the court at a minimum to lift the stay by then. If Venezuela were happened to prevail in this appeal, these additional judgments could come out. But there is some legitimate risk that if we don't get on the train as it's pulling out the station with regard to the procedures for the sale, we may miss the opportunity to do so. And, again, the last point on this, and I should have emphasized it earlier when I was talking about OFAC and the executive orders, Your Honor, is that we now have an OFAC license specifically to permit these judgments and the writs of attachments here to be added to the sale process that the district court has underway. OFAC has determined that doing so is consistent with the interests of the United States and the policies of the United States with regard to Venezuela. There is no argument that recognizing these attachments and allowing them to go forward is in any way inconsistent with federal policy or would abuse in any way privileges and roles that are preserved to the executive. OFAC at this point is on board with these moving through. Of course, it's up to the district court to decide if these are additional judgments that should be added to that sale, and that is an ongoing process there. But there is some risk that if the stay is in place, that might push us out of that, and that's where irreparable harm would come in. Thank you, Your Honors. Thank you, Mr. Simons. Mr. Berrilli, you have five minutes. Thank you. I'd like to make two points about the Maduro versus interim government issue, two points about the facts with respect to the interim government, and then turn to the Rule 69 issue. First, the executive orders that my friend from the other side relied on, they're at page 4635 of the JA. I commend that to the Court's attention. It specifically says the Maduro regime is an illegitimate government, that the Guaido regime is a legitimate government, and that the operation of this definition is for purposes of these sanctions only. And, of course, that makes sense because what they're trying to do is protect against depredations of the Maduro regime. It has no bearing, none, on the issue before the Court. How about the Republic of Iraq discussion that Mr. Simons raised? That's my next point. That's a completely different situation with respect to the Republic of Iraq. What that case basically holds is that if Saddam Hussein commits a tort, that the fact that there's a subsequent government after Saddam Hussein doesn't mean that the government of Iraq isn't on the hook for Saddam Hussein's tort, but they're doing something entirely different here. What they're saying is that they can come to the United States and attach the assets of Pena Vesa in the United States, and what Banchik says then is that you apply standard alter ego principles to that analysis, and it's a completely different situation from those cases. They really don't have any bearing here. This actually seems more like tort liability to me. I mean, I think you were on strong ground in saying that legislation of the Maduro regime will not be treated as valid legislation. It shouldn't be used as a sort. But here we're talking about holding liability precisely for some depredations of the Maduro regime. Why should the Maduro regime then get off of having these assets preserved? I apologize for interrupting, but we're not talking about liability. That's the key. We're talking about attaching assets. Attaching assets in the service of holding a regime liable. We're talking about attaching assets that are assets of Pena Vesa on the theory that they should be treated as the republic's assets. That's a Banchik inquiry, and at that point, the act of state doctrine does kick in, and you have to look at the question of separateness taking into account the actions of the National Assembly. I think it's a fundamentally different situation. I really do. Let me just, so I can save some time for Rule 69, make one point, if I could, about the commingling. My friend said, well, it wasn't just a newspaper article. It was the expert testimony of Mr. Gomez. I'd refer the Court to Joint Appendix pages 83, 45 to 47, and 53 to 54, where Mr. Gomez, on cross-examination, retracted that factual assertion and acknowledged that he was an expert only on the law. Now, with respect to Rule 69, my friend's lead argument is that this issue was already decided. We've laid out in our briefs what we think has to be the only fair reading of the Court's decision in Crystal X-2. The Court said it was a jurisdictional decision. When it said it affirmed, at the end of the opinion, it said the district court had jurisdiction over PDVSA and over the assets, we therefore affirm. And it would be quite a striking thing, I think, to say that that decision, and, you know, the Court can review the decision for itself and review the briefing for itself. What the Court will find in the briefing is that the issue that we are debating now was not briefed, was not raised. But there's an interior question that you talked about, which is I have doubts that we even have pendent appellate jurisdiction here. I mean, there's enough differences in the facts that we need to get into here. So you argue that at most we have discretion to get there, right? You're not arguing we're compelled to. But what even authorizes us to say that this is really, that it's not the same issue we have to resolve here? The facts are, you know, severely different. So I think under the Palco test, questions whether something's intertwined is whether it arises out of the same nucleus of operative fact, and that different facts in the nucleus of operative fact went to the question of whether there was an FAA, whether it was enforceable under the FAA and whether it was enforceable under state law, but it was sufficiently close. Now here, with respect to this issue, we are actually arguing about the same set of facts and whether that set of facts justifies attachment under state law, Delaware law, under Rule 69A. There really isn't any factual dispute. It's really a legal dispute. And this Court has in prior cases also said that considerations of practicality and judicial economy can bear on this inquiry. And here, as Mr. Salmons explained, there's going to be an enormous amount of litigation in the district courts about how, if at all, these additional claims fit into the sales process being devised in Crislogs. It would all be totally unnecessary if we're right. Thank you, Mr. Verrilli. Thank both sides for a well-briefed and well-ordered case. We'll take it under advisement. We ask that the parties prepare a transcript and split the call.